# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
## SOUTHERN DIVISION

| | | |
|---|---|---|
| CHARLES E. WILLIAMS, | ) | |
| | ) | |
| Plaintiff. | ) | |
| | ) | |
| v. | ) | Case No. 04-5055-CV-S-GAF |
| | ) | |
| CITY OF CARL JUNCTION, MO., | ) | |
| JAMES WISDOM, JOHN HOFER, and | ) | |
| JOSEPH BARFIELD, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

Presently before the Court are two Motions for Summary Judgment. The Defendant City of Carl Junction, Missouri ("City") filed the first Motion. (Doc. #56). The second Motion was filed by the remaining Defendants, James Wisdom, John Hofer and Joseph Barfield.[1] (Doc. # 58). The Court will rule on both of these Motions in the present Order due to the similarity of the facts and arguments presented therein. The Plaintiff, Charles E. Williams ("Williams"), opposes these Motions arguing that genuine issues of material fact preclude summary judgment. (Doc. #68). The Court, upon careful consideration of the facts and arguments presented by the parties, HEREBY GRANTS the Defendants' Motions for Summary Judgment.

## DISCUSSION

---

[1] James Wisdom served as the Mayor of the City from April 1998 through April 2005 and will be referred to as "Mayor." John Hofer served as the City's Police Chief from November 6, 2001 to January 1, 2005 and will be referred to as "Police Chief." Joseph Barfield has been the City Administrator since March 2002 and will be referred to as "Administrator." These individuals have all been sued in both their official and individual capacities. (Doc. #1).

# I.    Facts

Williams identifies himself as a "vociferous critic of City policies and actions." (Doc. #68).  He claims that he is "well known to City officials, frequently attending and speaking out at City Council meetings." Id.  He characterizes himself as a "crass, often rude and profane, gadfly." Id.  Williams admits that he "can be an obstreperous pest – a 'pain in the neck' – when he takes a position on issues." Id.

Williams filed this action asserting that in response to his strident opposition to City policies and actions, the City, its Mayor, its Police Chief, and its Administrator, have retaliated against him in violation of his First Amendment rights by issuing over 26 separate citations for various violations of City ordinances.  (Doc. #1, Doc. #68).  The citations, beginning in July 2002, include business license violations, parking violations, solid waste violations, a peace disturbance, harassment by telephone, failure to yield to an emergency vehicle, nuisance violations, and a setback regulation violation.  (Doc. #68, Ex. 1).  Williams asserts that the issuance of these citations has "chilled" his desire to speak out in opposition to City policies and actions.  (Doc. #1, Doc. #68).

Williams' four-count complaint against the City, its Mayor, its Police Chief and its Administrator asserts the following claims:  Count I: 42 U.S.C. § 1983, First Amendment Retaliation against all Defendants; Count II: 42 U.S.C. § 1985, Conspiracy against the Mayor, the Police Chief and the Administrator; Count III: Malicious Prosecution against the Mayor, the Police Chief and the Administrator; Count IV: Intentional Infliction of Emotional Distress against the Mayor, the Police Chief and the Administrator.  (Doc. #1).  The Mayor, Police Chief and Administrator moved for summary judgment on all claims.  (Doc. #60).  Williams did not respond to their arguments regarding Counts III or IV.  (Doc.

#68).  Accordingly, the Court finds that Williams has conceded his Malicious Prosecution and Intentional Infliction of Emotional Distress claims and these claims will not be further addressed in this Order.

       **A.**       *Twelve Citations for Failure to Obtain a Business License: July – November 2002*

Williams was issued his first relevant citation on July 25, 2002 for violating the City's ordinance regarding business licenses.  (Doc. #86, Ex. 1).  The City's Code provides:

> Every applicant for a license required by this Chapter who shall carry on any occupation, trade, pursuit, business or vocation included in this Chapter, in two (2) or more different places of business, shall secure a separate license for each place of business and shall also secure a separate license wherein they engage in more than one (1) occupation at such address and location.

(Doc. #57, Ex. 5).

In 1999, Williams applied for and received a business license for automotive repair to be conducted at 104 East Allen under the business name, "The City Garage."  (Doc. #57, ¶ 14).[2]  This business license was renewable each year upon Williams' payment of the renewal fee to the City.  <u>Id</u>.  As a result of Williams' renewals, this license was valid from May 5, 2002 through May 5, 2003.  (Doc. #57, ¶ 15).

In 2001, Williams applied for and received a business license for automotive repair to be conducted at 110 West Pennell Street under the business name, "The City Garage."  (Doc. #57, ¶ 16).  Williams did not renew this business license and the license expired in June 2002.  <u>Id</u>.

_____

[2]As previously noted the City and the individual Defendants filed separate Motions for Summary Judgment.  However, the fact paragraphs, numbered one (1) through ninety-four (94) in the City's Motion for Summary Judgment are identical to the fact paragraphs of the individual Defendants' Motion for Summary Judgment with the exception that paragraph number nine (9) was omitted in the latter Motion.  In the interest of simplicity, the Court will cite only to the statement of facts corresponding to the City's Motion for Summary Judgment and Williams' response to these facts.

On July 17, 2002, Williams applied for a business license for automotive sales to be conducted at 110 West Pennell Street under the business name, "CJ Auto Sales." (Doc. #57, ¶ 17). Maribeth Matney ("Matney"), the City Clerk, recalls that Williams told her that he intended to sell cars at the 110 West Pennell Street location and that he would also be doing auto repair at that location on the cars he was going to sell. (Matney's Dep. 19:2-16; 44:12-45:12). Matney told Williams that "the repairs of the cars that he was going to be selling would fall under the [auto sales] license." Id. Matney further told Williams that if he was going to be working on cars that were not going to be for sale at the 110 West Pennell Street location that he would need a separate license. Id. On July 17, 2002, Williams received a business license for automotive sales to be conducted at 110 West Pennell Street under the business name, "CJ Auto Sales." (Doc. #57, ¶ 20).

Despite Matney's advice, the City subsequently decided that Williams did not have a valid business license for automotive repair at the 110 West Pennell location for the time period commencing July 25, 2002 and ending November 22, 2002. (Doc. #57, ¶ 21). The City required Williams to obtain two separate licenses for the 110 West Pennell Street location because "automobiles" and "garage" are identified as separate and distinct business licenses in § 605.080 of the City Code. (Matney's Dep. 99:12-100:20). Williams disagreed with the determination that the City Code required him to obtain two separate licenses to sell cars and repair the cars he intended to sell at the 110 West Pennell Street location. (Doc. #57, ¶ 19).

Sometime after July 17, 2002, Matney communicated with the Police Chief on multiple occasions concerning Williams' failure to obtain a license to repair cars at the 110 West Pennell Street location. (Doc. #57, ¶ 22). From July 25, 2002 through November 22, 2002, Williams received 12 citations for

4

failing to obtain a valid business license for automotive repair at the 110 West Pennell location.  (Doc. #57,

¶ 23).  These citations are summarized as follows:

| | |
|---|---|
| July 25, 2002 | Ticket No. 010-709350, Case No. 20-02-630 |
| August 16, 2002 | Ticket No. 020283641, Case No. 20-02-696 |
| August 23, 2002 | Ticket No. 020283642, Case No. 20-02-704 |
| August 30, 2002 | Ticket No. 020283643, Case No. 20-02-752 |
| September 6, 2002 | Ticket No. 020283644, Case No. 20-02-761 |
| September 13, 2002 | Ticket No. 020283645, Case No. 20-02-773 |
| September 23, 2002 | Ticket No. 020283646, Case No. 20-02-782 |
| October 15, 2002 | Ticket No. 020283647, Case No. 20-02-850 |
| October 17, 2002 | Ticket No. 020283648, Case No. 20-02-855 |
| October 28, 2002 | Ticket No. 020284214, Case No. 20-02-927 |
| November 20, 2002 | Ticket No. 020284215, Case No. 200-21-029 |
| November 22, 2002 | Ticket No. 020284216, Case No. 200-21-028 |

Each citation was issued by the Police Chief for a violation of City Ordinance § 605.050.  Id.  Williams

disagrees with the City's determination that the Code required him to obtain two separate business licenses

for the 110 West Pennell Street location to sell and repair cars.  (Doc. #68, CSOF ¶¶ 24-25).  However,

Williams admits that every time the Police Chief cited him for violations of City Ordinance § 605.050, the

Police Chief would personally drive by and observe whether Williams was operating a business repairing

cars without the required business license to repair cars.  (Doc. #57, ¶ 24).  Williams further admits that

every time the Police Chief cited Williams for violating City Ordinance § 605.050, the Police Chief would

first check with or be notified by Matney that Williams did not have a valid license for automotive repair

at the 110 West Pennell Street location.  (Doc. #57, ¶ 25).

On September 17, 2002, in between the citations issued on September 13, 2002 and September

23, 2002, Williams appeared at a City Council meeting to address the Council regarding parking at 110

West Pennell.  (Doc. #57, ¶ 93).  On October 1, 2002, in between the citations issued on September 23,

2002 and October 15, 2002, in a discussion about the City's Rails for Trails initiative, Williams remarked that the City should get ready for a legal battle.  Id.

When the Police Chief cited Williams for failing to have a required business license on August 16, 2002, Williams refused to sign the citation and yelled that the Police Chief was a "fucking asshole," "was like the rest of them," and "needed to learn what [Williams] could do."  (Williams Dep. 271:9-13).  The Police Chief informed Williams that he could issue Williams a citation for every day that Williams was operating a business without a license and reminded him that the Police Chief had not ticketed him every day.  (Williams Dep. 271:4-8).  On August 23, 2002, when the Police Chief issued Williams another citation for operating a business without a license, Williams made an obscene gesture, commonly referred to as "the bird," towards the Police Chief.  (Hofer Aff. ¶ 15).

All 12 of the citations issued to Williams for violating § 605.050 were consolidated for trial on December 18, 2002  before the Circuit Court of Jasper County, Missouri, Municipal Division at Carl Junction.  (Doc. #68, Ex. 4).  The Court found that the City deviated from the Code's mandates on the issuance of business licenses by issuing licenses: (1) for different periods of time in contradiction to § 605.040; (2) which were not signed by the City Clerk in contradiction to § 605.303; and (3) which authorized "business within boundaries of said city" in contradiction to § 605.050.  Id.  The Court found that the licenses issued to Williams for CJ Auto Sales and The City Garage authorized said businesses to operate "within the boundaries of said city" and were not restrictive in respect to the location of the business.  Id.  The Court concluded, "[t]he City Garage and CJ Auto Sales conducted their business at the location of 110 West Pennell, Carl Junction, Missouri, with valid City business licenses in accordance with the guidelines as established by the City."  Id.  Therefore, the Court found Williams not guilty in all case

6

numbers except Case No. 20-02-782 corresponding to the ordinance issued on September 23, 2002. Id. The Court found that on September 23, 2002, Williams engaged in a vocation or pursuit independent of The City Garage and CJ Auto Sales, in repairing the tail lights of Sherry Minsink's automobile at 110 West Pennell. Id.

**B.    Parking and Solid Waste Citations: July – November 2002**

During the five month period when Williams received 12 citations for failing to obtain a business license, Williams also received four parking citations and two solid waste citations. (Doc. #68, Ex. 1). The four parking citations occurred prior to Williams' September 17, 2002 and October 1, 2002 appearances before the City Council. (Doc. #68, Ex. 1, Doc. #57, ¶ 93). The two solid waste citations occurred after Williams' September 17, 2002 and October 1, 2002 appearances before the City Council. (Doc. #68, Ex. 1, Doc. #57, ¶ 93).

**1.    Parking Citations**

On August 28, 2002, City Police Officer Scott Hollingshead ("Hollingshead") issued Williams two citations for parking two cars in excess of two hours in front of his business at 110 West Pennell. (Doc. #57, ¶ 31-32). Williams admits that he was aware that parking on the street outside of his business was limited to two hours. (Doc. #68, CSOF ¶ 34). Williams further admits that Police Officer Hollingshead observed him park two vehicles on the street in front of Williams' business and leave them there for more than two hours. (Doc. #68, CSOF ¶ 31). Williams admits that these citations were issued, but asserts that he was "exonerated" of the parking violations. (Doc. #68, PSOF ¶ 69). The Defendants respond that these violations were dismissed as the result of a plea bargain with the City prosecutor. (Doc. #75, Resp. PSOF ¶¶ 69-71).

7

On August 30, 2002, Williams was issued a citation for violating City Ordinance § 355.010 when he parked a Winnebago partially over the sidewalk in front of his business while he personally performed an automotive inspection on the vehicle. (Doc. #57, ¶¶ 37-38). City Ordinance § 355.010 provides: "Except when necessary to avoid a conflict with other traffic, or in compliance with the law or the directions of a Police Officer or official traffic control device, no person shall: 1.) Stop, stand or park a vehicle . . . b.) on a sidewalk." (Doc. #57, ¶ 39). Williams admits that the Winnebago was partially parked across a sidewalk and a citation was issued, but asserts that he was "exonerated" of this parking violation. (Doc. #68, CSOF ¶¶ 37-38, PSOF ¶ 71). The Defendants respond that this violation was dismissed as the result of a plea bargain with the City Prosecutor. (Doc. #75, Resp. PSOF ¶¶ 69-71)

On September 10, 2002, City Police Officer Don Marshall ("Marshall") observed Williams park a vehicle on the street in front of his business at 110 West Pennell and leave it there for more than two hours. (Doc. #57, ¶ 34). Consequently, Officer Marshall issued Williams a citation for parking in excess of two hours. (Doc. #57, ¶ 34). Williams admits that a sign on the street outside of his business at 110 West Pennell indicated that parking in excess of two hours was prohibited and Williams further admits that Officer Marshall observed him leave a car parked in that space for longer than two hours. (Doc. #68, CSOF ¶¶ 33-35). Williams further asserts that he was "exonerated" of this parking violation. (Doc. #68, PSOF ¶ 70). The Defendants respond that this violation was dismissed as the result of a plea bargain with the City Prosecutor. (Doc. #75, Resp. PSOF ¶¶ 69-71).

2.      **Solid Waste Citations**

8

Williams was issued two citations for solid waste disposal in violation of City Ordinance § 225.030.

(Doc. #68, Ex. 1). City Ordinance § 225.030 provides:

> The City shall provide for the collection of solid waste as follows: . . . 2. The City shall provide for the collection of all commercial and industrial solid waste . . . in conformity with the contract for solid waste collection existing between the City of Carl Junction and American Disposal Services of Missouri, Inc. . . . I. All solid waste generated from premises in the City shall be collected by the solid waste collector.

(Doc. #57, ¶ 26). On October 24, 2002, the Police Chief drove by Williams' property located at 413 East Pennell Street and observed a dumpster on the property bearing a logo from a company other than American Disposal. (Doc. #57, ¶ 28). The Police Chief issued Williams a citation for violating City Ordinance § 225.030. Id. On October 28, 2002, the Police Chief drove by Williams' 413 East Pennell Street property a second time and noticed a different dumpster on the property bearing a logo from a company other than American Disposal. (Doc. #57, ¶ 29). The Police Chief cited Williams again for violating City Ordinance § 225.030. Id.

Williams admits that he did not have permission from the City to use any dumpsters other than those from American Disposal. (Doc. #68, CSOF ¶ 30). However, Williams asserts, the two solid waste disposal citations were ultimately dismissed. (Doc. #68, CSOF ¶¶ 28-29). The Defendants respond that these citations were dismissed as the result of a plea bargain with the City Prosecutor. (Doc. #75, ¶¶ 28-29).

9

C.     *Various Citations: 2003*

    **1.     February/March 2003: Citation for Peace Disturbance**

On February 18, 2003, Williams made an appearance at a City Council meeting and participated in a discussion regarding City water towers and improvements. (Doc. #57, ¶ 93). The next day, Samuel Short ("Short"), a citizen of Carl Junction, and Douglas Miller, the City Prosecutor, signed a Complaint and Information against Williams. (Doc. #57, ¶ 65). The Complaint and Information asserted that Williams created a peace disturbance in violation of City Ordinance § 210.360. Id. City Ordinance § 210.360 provides:

> A person commits the offense of peace disturbance if: 1. He/she unreasonably and knowingly disturbs or alarms another person or persons by . . . b. Offensive language addressed in a face-to-face manner to a specific individual and uttered under circumstances which are likely to produce an immediate violent response from a reasonable recipient.

(Doc. #57, ¶ 68). Williams was directed to appear in Municipal Court on March 19, 2003 regarding this charge. (Doc. #57, ¶ 65).

Officer Hollingshead investigated the Complaint and was informed by Short that Williams gave him "the bird." (Doc. #57, ¶ 66). Short reported that when he asked Williams about giving him "the bird" Williams replied, "You owe me money, asshole." Id. Williams again gave Short "the bird" and told Short, "Fuck you." Id. Williams admits that Short's version of the events is accurate. (Doc. #57, ¶ 67).

On March 25, 2003, Williams appeared at a City Council meeting and the public forum concluded with a discussion regarding payment of Williams' attorney's fees. (Doc. #57, ¶ 93). This marks Williams' final appearance before the City Council. Id. Williams testified on May 24, 2005 that he had avoided going to City Council meetings for a year or more. (Williams Dep. 389:13-16).

10

### 2. April 2003: Citation for Telephone Harassment

On April 1, 2003, Carl Junction citizen Howard McCully ("McCully") reported to Officer Hollingshead that Williams was making repeated phone calls to him and that Williams continued to call after instructed not to do so. (Doc. #57, ¶ 74). On April 6, 2003, McCully signed a Complaint and Information against Williams, claiming that Williams harassed him by phone, making "repeated unwanted phone calls" in violation of City Ordinance § 210.050. (Doc. #57, ¶ 72). City Ordinance § 210.050 provides:

> A person commits the offense of harassment if, for the purpose of frightening or disturbing another person he/she does any of the following: . . . 2. Calls the victim on the phone or sends the victim a written message in which he/she uses coarse language that would be offensive to one of average sensibility; or . . . 4. Makes repeated phone calls.

(Doc. #57, ¶ 73). Williams asserts that the prosecutor entered a nolle prosequi on the McCully telephone harassment charges. (Doc. #68, PSOF ¶ 75). The Defendants assert that Williams has failed to inform the Court that the nolle prosequi entry was a result of a plea bargain between Williams and the City prosecutor. (Doc. #75, Resp. PSOF ¶¶ 74-75).

### 3. November 2003: Citation for Failure to Yield

On November 4, 2003, City Police Officers Jared Richmond ("Richmond") and Nick Booe ("Booe") made a vehicle stop on Williams' son, Dustin Williams. (Doc. #57, ¶ 75). After the vehicle stop of Dustin Williams, Officer Richmond observed Williams' automobile and believed that Williams was following Officer Richmond for several city blocks. (Doc. #57, ¶ 76). Williams admits that he was following Officer Richmond, but alleges that this was a mere "coincidence." (Doc. #68, ¶ 77).

Officer Richmond alleges that he engaged his emergency lights and attempted to stop Williams but Williams accelerated past him. (Doc. #57, ¶ 78). Officer Booe then angled his police car in front of

11

Williams and Williams stopped his car.  Id.  Williams denies this version of the events.  (Doc. #68, PSOF ¶ 76).  Williams asserts that he was following Officer Richmond, Officer Richmond turned around, Williams pulled into a driveway, and then the police pulled behind him and got him out of the car, threatening to arrest him for stalking a police officer.  Id.  Williams contends that after consulting with the Police Chief, the Officers instead cited Williams for failure to yield to an emergency vehicle.  Id.

City Ordinance § 310.070 requires a motorist to yield to an emergency vehicle:

> Upon the immediate approach of an authorized emergency vehicle . . . 1. The driver of every other vehicle shall yield the right-of-way and shall immediately drive to a position parallel to, and as close as possible to, the right-hand edge or curb of the roadway clear of any intersection and shall stop and remain in such position until the authorized emergency vehicle has passed.

(Doc. #57, ¶ 80).  Williams admits that he thanked the Officers for stopping him because it would add to his lawsuit.  (Doc. #57, ¶ 81).  Williams points out that the prosecutor subsequently entered a nolle prosequi on the charges.  Id.  Again, the Defendants assert that the nolle prosequi entry in the case was the result of a plea bargain between Williams and the City Prosecutor.  (Doc. #75,  Resp. PSOF ¶ 76).  In 2003, the City issued seven citations for failure to yield to an emergency vehicle, only one of which was issued to Williams.  (Doc. #57, ¶ 82).

**D.     Various Citations: 2004**

On January 24, 2004, Officer Marshall was driving by Williams and Williams greeted him with "an upraised arm and middle finger."  (Doc. #57, ¶ 94).

12

### 1. March/April 2004: Citation for Failure to Post House Numbers

Misty Forrester ("Forrester") is the Code Enforcement Officer for the City. (Doc. #57, ¶ 40). Officer Forrester is responsible for enforcing the City's "nuisance" ordinances. (Doc. #57, ¶ 41). On March 21, 2004, while on routine patrol, Officer Forrester observed that Williams' residence did not have house numbers displayed. (Doc. #57, ¶ 52). Williams admits that he did not have house numbers displayed on his house at that time. (Doc. #57, ¶ 53). Williams claims that he did not have house numbers on his house because he was in the process of re-siding his house after it was damaged by a storm. (Doc. #68, CSOF ¶ 53). City Ordinance § 500.130 provides:

> The responsibility for the displaying of the assigned number for each house and building in the City shall rest with the property owner . . . Any house or building found to be in violation of this Chapter shall be subject to a notice of violation and given ten (10) days to abate said nuisance.

(Doc. #57, ¶ 54). On March 21, 2004, Officer Forrester sent a 14-day compliance letter to Williams which stated:

> It has come to the attention of the City of Carl Junction that you are not in compliance with one or more of the following City Ordinances. If you comply within 14 days from the date of this notice no further action will be taken. If you are not in compliance within 14 days, a summons will be issued with a mandatory court appearance with a possibility of a fine being imposed by the Judge.

(Doc. #57, ¶ 55).

On April 4, 2004, Officer Forrester returned to Williams' residence to determine if he remained in violation of the City ordinance requiring the display of house numbers. (Doc. #57, ¶ 59). Finding that Williams was not in compliance, Officer Forrester issued a citation to Williams for his apparent violation of City Ordinance § 500.130. (Doc. #57, ¶ 60). Williams alleges that his wife put the house numbers back

13

on the house, although he is unsure of when she did so. (Doc. #68, PSOF ¶ 73). Williams further contends that the charges against him were dismissed on June 16, 2004 when he appeared for trial. (Id., Doc. #68, Ex. 1). The Defendants assert that it is the City's practice to dismiss nuisance violation cases if the nuisance is abated at the time of trial, as was the case with the April 4, 2004 citation issued to Williams by Officer Forrester. (Doc. #75, Resp. PSOF ¶¶ 72-73).

While on routine patrol on March 21, 2004, Officer Forrester observed numerous other people, 18 in total, who live on Williams' street and in the surrounding neighborhood who were in violation of the City ordinance requiring the display of house numbers. (Doc. #57, ¶ 56). Officer Forrester also issued 14-day compliance letters to those residents. Id. In 2004, Officer Forrester issued 276 notices for failure to maintain house numbers. (Doc. #57, ¶ 57). In 2004, the City issued 43 citations for failure to maintain house numbers, only one of which was issued to Williams. (Doc. #57, ¶ 58).

### 2. June 2004: Incident with Motorcycle Driver

In June 2004, Williams approached a motorcycle driver who had been pulled over for speeding. (Williams' Dep. 190:3 - 192:12). Williams had observed the motorcycle pass his business five blocks from where the motorcycle driver had been pulled over. Id. Williams was of the opinion that the motorcycle driver was not speeding. Id. After voicing his opinion to one of the Police Officers on the scene, Williams told the Officer, "suck my dick, asshole." Id.

### 3. May/June 2004: Citation for Nuisance Violation

On May 27, 2004, Officer Forrester observed what she believed was a nuisance ordinance violation concerning the height of the grass and weeds on Williams' property located at 415 East Pennell. (Doc. #57, ¶ 42). City Ordinance § 215.220 provides:

14

It shall be unlawful for the owner of any parcel of ground located within the corporate limits of the City to allow or maintain on any such parcel of ground any growth of weeds to a height in excess of ten (10) inches.

(Doc. #57, ¶ 43). On May 27, 2004, Officer Forrester sent a 14-day compliance letter to Williams stating:

It has come to the attention of the City of Carl Junction that you are not in compliance with the following City Ordinance(s). If you comply within 14 days from the date of this notice no further action will be taken. If you are not in compliance within 14 days a summons will be issued with a mandatory court appearance with the possibility of a fine being imposed by the Judge.

(Doc. #57, ¶ 44). Williams acknowledged that the height of the grass and weeds on his property exceeded 10 inches. (Doc. #57, ¶ 45).

On June 14, 2004, more than 14 days after her initial observation of the property, Officer Forrester returned to Williams' property and observed that the grass and weeds on the property were still in excess of 10 inches of height. (Doc. #57, ¶ 46). Consequently, on June 14, 2004, Officer Forrester issued a citation to Williams for violating City Ordinance § 215.220. (Doc. #57, ¶ 47). Williams cut the weeds and grass prior to his scheduled Court appearance. (Doc. #57, ¶ 51). The charges against Williams were dismissed on September 15, 2004 when he appeared for trial. (Doc. #68, Ex. 1). The Defendants assert that it is the City's practice to dismiss nuisance violation cases if the nuisance is abated at the time of trial, as was the case with the June 14, 2004 citation issued to Williams by Officer Forrester. (Doc. #75, Resp. PSOF ¶¶ 72-73).

On May 27, 2004, Officer Forrester observed three other properties in violation of the City's ordinance prohibiting grass and weeds in excess of 10 inches in height. (Doc. #57, ¶ 48). Officer Forrester issued 14-day compliance letters to those residents. Id. In 2004, Officer Forrester issued 77 notices for violations of City Ordinance § 215.220. (Doc. #57, ¶ 49). In 2004, the City issued six

15

citations for grass and weeds in excess of 10 inches in height, only one of which was issued to Williams. (Doc. #57, ¶ 50).

### 4.     December 2004: Various Citations

On October 22, 2004, Williams was notified by the Administrator that a storage building on Williams' property extended into an alley in violation of the City's set back regulations found in § 405.080(3) of the City Code.  (Doc. #57, ¶ 61).  Williams was given until November 8, 2004 to comply with the ordinance.  <u>Id</u>.  Officer Forrester conduct an inspection of Williams' residence and determined that Williams was not in compliance with City Ordinance § 405.080.  (Doc. #57, ¶ 62).  Officer Forrester determined that there was an encroachment of Williams' storage shed into the City's alleyway.  (Doc. #57, ¶ 63).  On December 16, 2004, Officer Forrester issued a summons to Williams for violating City Ordinance § 405.080.  (Doc. #57, ¶ 64).

The City retained the firm of Allgeier Martin to assist in presenting evidence to establish that Williams had violated the setback regulations.  (Doc. #68, ¶ 40).  Following a trial, the court found that Williams was "not guilty."  (Doc. #68, Ex. 19).  The judge gave no rationale for his ruling.  <u>Id</u>.

While Officer Forrester was conducting her investigation of the set back violation, she also issued Williams citations for parking in the alley and for a pile of chat.  (Doc. #68, PSOF ¶ 38).  Williams contends that he was "exonerated" on both charges.  <u>Id</u>.  The Defendants assert that the charges were dismissed as the result of a plea bargain with the municipal prosecutor.  (Doc. #75, Resp. PSOF ¶¶ 38-57).

16

### E. The City's Purported Property Purchases

#### 1. The 110 West Pennell Property

Williams asserts that he first "crossed [the Mayor's] path" in either 2000 or 2001 when the Mayor approached John Warner ("Warner"), who then owned the 110 West Pennell property, to inquire about the City obtaining the property to use as a parking lot. (Doc. #68, PSOF ¶ 12). Warner told the Mayor that Williams had already inquired about purchasing the property. Id. Williams claims that the Mayor attempted to obtain the property for less than its value by notifying the Missouri Department of Natural Resources (MDNR) of contamination problems at the site and threatening to condemn the property. Id. The Defendants deny any improper motive by the Mayor in contacting the MDNR or in his efforts to obtain the property. (Doc. #75, Resp. PSOF ¶¶ 12-14). Williams contends that he conducted a sampling and obtained a letter from the MDNR stating that there was no contamination which would detract from the property's value. (Doc. #68, PSOF ¶ 13). Williams began moving into Warner's building at 110 West Pennell and, after obtaining a license from the City, started doing business there in April 2002. (Doc. #68, PSOF ¶ 14). Eventually, Williams completed the purchase of the building from Warner. Id.

#### 2. The Shira Property

Williams asserts that he "also crossed [the Mayor's] path" when the Mayor contacted Bess and Everett Shira to inquire about the City obtaining their property. (Doc. #68, PSOF ¶ 15). Williams proceeds to detail a scheme that he claims the Mayor employed to obtain the Shira property at a depressed price. (Doc. #68, PSOF ¶¶ 16-20). The Defendants deny Williams' account of the events. (Doc. #75, Resp. PSOF 12-14). Williams claims that the Shiras ultimately refused to sell to the City and instead sold the property to Williams. (Doc. #68, PSOF ¶¶ 21-22). The real estate contract between the Shiras and

17

the Williamses was signed on July 10, 2002 and the property was deeded to the Williamses on July 25, 2002, the date the first ticket was issued for Williams' failure to obtain two business licenses for his operations at 110 West Pennell. (Doc. #68, PSOF ¶ 22).

F.    Other Evidence of Williams' Exercise of his First Amendment Rights

Williams provides the Court with additional evidence of his opposition to various City policies and practices. Williams claims that he questioned and opposed the propriety of the City's trash contract and spoke out about this issue at City Council meetings. (Doc. #68, PSOF ¶ 24). He claims that he opposed the City's annexation of property located at 171 Ivy Road and spoke out about the annexation at City Council meetings and assisted in a petition drive to stop the annexation. (Doc. #68, PSOF ¶ 25). Williams asserts that he questioned the City's provision of free water and the forgiveness of taxes owed by the Briarbrook Country Club. (Doc. #68, PSOF ¶ 26). Williams states that he disputed a lien placed on rental property he owned because of a tenant's unpaid water bill. (Doc. #68, PSOF ¶ 27). Finally, Williams declares that he complained about the placement of lead chat on roads and/or property adjacent to his that caused polluted run-off and leaching. (Doc. #68, PSOF ¶ 28). Williams does not identify the dates that he appeared before the City Council or otherwise protested the City's policies and practices.

II.    Standard

The Defendants filed these Motions for Summary Judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure. According to this Rule, summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). When considering this Motion, the Court views all facts in the light most

18

favorable to Williams and gives him the benefit of all reasonable inferences. *See* <u>Prudential Ins. Co. v. Hinkel</u>, 121 F.3d 364, 366 (8th Cir. 1997). The Court will not weigh the credibility of the evidence, but rather will focus on whether a genuine issue of material fact exists for trial. <u>Roberts v. Browning</u>, 610 F.2d 528, 531 (8th Cir. 1979); <u>United States v. Porter</u>, 581 F.2d 698, 703 (8th Cir. 1978).

The Defendants bear the burden of proving the absence of disputed material facts. *See* <u>Prudential Ins. Co.</u>, 121 F.3d at 366. The burden then shifts to Williams to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). Williams "must present more than a scintilla of evidence and must advance specific facts to create a genuine issue of material fact for trial." <u>Naucke v. City of Park Hills</u>, 284 F.3d 923, 927 (8th Cir. 2002) quoting <u>F.D.I.C. v. Bell</u>, 106 F.3 258, 263 (8th Cir. 1997).

If Williams fails to establish a factual dispute on an essential element of one of his claims, the Court will proceed to determine whether the Defendants are entitled to judgment as a matter of law on that claim. *See* <u>E.E.O.C. v. Woodbridge Corp.</u>, 263 F.3d 812, 814 (8th Cir. 2001). To survive summary judgment, Williams must make a sufficient showing concerning every essential element of his case on which he bears the burden of proof. <u>Osborn v. E.F. Hutton & Co., Inc.</u>, 853 F.2d 616, 618 (8th Cir. 1988)

The summary judgment rule is intended "to isolate and dispose of factually unsupported claims" and should be applied to accomplish this purpose. <u>Prudential Ins. Co.</u>, 121 F.3d at 366. In the interest of promoting judicial economy, summary judgment should be granted to prevent the trial of cases lacking a genuine issue of material fact. <u>Inland Oil and Transp. Co. v. U.S.</u>, 600 F.2d 725, 728 (8th Cir. 1979).

## III.    Analysis

### A.    <u>Count I: First Amendment Retaliation</u>

Case 3:04-cv-05055-GAF    Document 99    Filed 04/19/06    Page 19 of 36

In Count I of his Complaint, Williams asserts a claim arising under 42 U.S.C. § 1983 ("§ 1983") for alleged violations of his rights under the First Amendment. Specifically, Williams claims that the City, its Mayor, its Police Chief and its Administrator retaliated against him by issuing 26 citations for violating various city ordinances because he was a persistent critic of City policies and actions. The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. Amend. I. "The First Amendment right to free speech includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." Suarez Corp. Indus. v. McGraw, 202 F.3d 676, 685 (4th Cir. 2000) *citing* ACLU v. Wicomico County, Md., 999 F.2d 780, 785 (4th Cir. 1993) ("Retaliation, though it is not expressly referred to in the Constitution, is nonetheless actionable because retaliatory actions may tend to chill individuals' exercise of constitutional rights."); and Pickering v. Board of Educ., 391 U.S. 563, 574 (1968) (noting that retaliatory acts are "a potent means of inhibiting speech"). Accordingly, "retaliation by a government actor in response to an exercise of First Amendment rights forms a basis for § 1983 liability." Naucke v. City of Park Hills, 284 F.3d 923, 927 (8th Cir. 2002).

"However, not every action made in response to an individual's exercise of his First Amendment right to free speech is actionable retaliation." Suarez, 202 F.3d at 685 *citing* DiMeglio v. Haines, 45 F.3d 790, 806 (4th Cir. 1995). To establish a claim for First Amendment retaliation under § 1983, Williams must show that he: (1) "engaged in a constitutionally protected activity"; (2) that [the government official's] adverse action caused him to suffer an injury which would 'chill a person of ordinary firmness from continuing . . . in that activity'"; and (3) "that the adverse action was motivated in part by . . . the exercise

20

of his constitutional rights." Naucke, 284 F.3d at 927-28 *quoting* Carroll v. Pfeffer, 262 F.3d 847, 850 (8th Cir. 2001) *quoting* Bloch v. Ribar, 156 F.3d 673, 678 (6th Cir. 1998).

Here, the Defendants do not contest that Williams was engaged in a protected activity when he protested the City's policies and actions. (Doc. #57, p. 27). The First Amendment clearly protects Williams' right to criticize City officials, policies and actions. *See* Bloch, 156 F.3d at 678 *citing* Glasson v. City of Louisville, 518 F.2d 899, 904 (6th Cir. 1975) *quoting* New York Times v. Sullivan, 376 U.S. 254, 273 (1964) ("The right of an American citizen to criticize public officials and policies and to advocate peacefully ideas for change is 'the central meaning of the First Amendment.'"). Although Williams can satisfy the first prong of the Naucke test, he has failed to present sufficient evidence that the issuance of the citations was motivated by Williams' criticism of City officials and policy.[3] "Specific proof of improper motivation is required in order for plaintiff to survive summary judgment on a First Amendment retaliation claim." Curley v. Village of Suffern, 268 F.3d 65, 73 (2nd Cir. 2001).

1. ***The existence of probable cause to support the issuance of the citations negates a finding that the Defendants were motivated by a retaliatory animus.***

The Defendants argue that Williams has failed to prove that they were motivated by a retaliatory animus when issuing citations to Williams for violating various City ordinances. The Defendants contend that they were solely motivated by their intention to enforce the City's ordinances when issuing the citations.

---

[3]The Defendants also argue that Williams has failed to prove the second element of his First Amendment retaliation claim, i.e., that the issuance of the citations caused Williams to suffer an injury that would "chill a person of ordinary firmness from continuing in that activity." Because the Court finds that Williams has failed to prove that the Defendants were motivated by a retaliatory animus, the Court finds it unnecessary to reach the question of whether Williams has presented sufficient evidence to establish a genuine issue of material fact on the second element of his First Amendment retaliation claim.

21

Furthermore, the Defendants argue that each citation issued to Williams was supported by probable cause and, therefore, Williams cannot prove that the Defendants were motivated by Williams' exercise of his First Amendment rights.

The Eighth Circuit has recognized that although an officer's arresting motive is generally irrelevant, "an officer's reason for making an arrest may be relevant when the claimant alleges that he was arrested for exercising his right to speak freely and there was **no other basis** to justify the arrest." Foster v. Metropolitan Airports Com'n, 914 F.2d 1076, 1080-81 (8th Cir. 1990) *citing* Bailey v. Andrews, 811 F.2d 366, 372 (7th Cir. 1987) (emphasis added). In Smithson v. Aldrich, 235 F.3d 1058 (8th Cir. 2000), the Eighth Circuit found that probable cause could constitute the "other basis" to justify an arrest and preclude the inquiry into the police officer's arresting motive. In Smithson, the Eighth Circuit held that a law enforcement officer is shielded by qualified immunity from a First Amendment retaliation claim if the officer had probable cause to arrest the plaintiff. Smithson, 235 F.3d at 1063. The plaintiff in Smithson argued that officers arrested him not to enforce the city's sound ordinance, but rather because they disagreed with his statements to an assembled crowd. Smithson, 235 F.3d at 1063. The Eighth Circuit found that, under the circumstances, the officers had reason to believe that the plaintiff had incited the crowd and, therefore, even if there was any evidence in the record that the plaintiff's arrest was motivated by the exercise of his First Amendment rights, "it would not nullify the finding of probable cause to believe that Smithson was violating the sound ordinance, nor would it prevent the application of the qualified immunity defense." Id.

In Curley v. Village of Suffern, 268 F.3d 65, 73 (2nd Cir. 2001), the Second Circuit applied this legal premise to the merits of a First Amendment retaliation claim. The plaintiff in Curley filed suit against

Case 3:04-cv-05055-GAF   Document 99   Filed 04/19/06   Page 22 of 36

a city, its mayor, its police chief, and several police officers alleging that they arrested him in violation of his First Amendment rights. Curley, 268 F.3d at 68. The plaintiff claimed that he was arrested in retaliation for his public criticism of the city's mayor and police chief. Id. The trial court granted summary judgment in favor of all defendants on the plaintiff's First Amendment retaliation claim and the plaintiff appealed. Id. at 69. The Second Circuit affirmed the trial court's entry of summary judgment in favor of the defendants finding that the plaintiff failed to prove the third element of his First Amendment retaliation claim: "Because defendants had probable cause to arrest plaintiff, an inquiry into the underlying motive for the arrest need not be undertaken." Id. at 73.

Extending Foster, Smithson, and Curley to the facts of the present case, the Court finds that if probable cause for an arrest is sufficient to defeat a First Amendment retaliation claim, then probable cause for the issuance of a citation is also sufficient to defeat a First Amendment retaliation claim. Accordingly, if the citations issued to Williams were supported by probable cause, the Court need not inquire further into whether the Defendants were "motivated in part" by a desire to retaliate against Williams for exercising his right to criticize City officials and City polices.

Probable cause exists if at the moment the citation was issued, "the facts and circumstances within [the police officer's] knowledge and of which the [police officer] had reasonably trustworthy information were sufficient to warrant a prudent man in believing" that Williams had violated a City ordinance. *See* Hunter v. Bryant, 502 U.S. 224, 228 (1991) *quoting* Beck v. Ohio, 379 U.S. 89, 91 (1964). For all of the citations but one, Williams either admits to engaging in the unlawful conduct triggering the issuance of the citation or admits that the police officer conducted an investigation into the facts and circumstances of Williams' violative conduct prior to issuing the citation.

23

The Police Chief issued each of the twelve citations Williams received for failing to obtain a business license. Williams admits that every time the Police Chief cited him for violations of the City ordinance related to business licenses, the Police Chief would personally drive by and observe whether Williams was operating a business repairing cars without the requisite business license to repair cars. Although Williams disagrees with the Police Chief's "assessment of the facts" and "conclusions," the record reveals that the Police Chief had probable cause to issue Williams citations for failing to obtain a business license as required by the City Code as he personally observed Williams violating the ordinance. The fact that a court ultimately concluded that the City misinterpreted the statute does not nullify the finding of probable cause.

With respect to the two parking citations he received in 2002, Williams admits that he was aware that parking on the street in front of his business was limited to two hours. Williams further admits that Officer Hollingshead observed him park two vehicles on the street in front of Williams' business and leave them there for longer than two hours. As Williams admits that the police officer issuing the citations had personal knowledge that Williams was violating the City's parking ordinances, probable cause existed to issue the citations. With respect to the third parking citation he received in 2002, Williams admits that the Winnebago was partially parked across the sidewalk. As Williams admits the underlying offense, probable cause clearly existed to issue the citation. The fact that the parking violations were subsequently dismissed as the result of a plea bargain does not nullify the finding of probable cause.

Williams admits that the Police Chief drove by Williams' property on two separate occasions and twice observed Williams using a dumpster on his property bearing a logo from a company other than American Disposal, the company which the City had contracted with for solid waste disposal. Williams

24

admits that he did not have permission from the City to use any dumpsters other than those from American Disposal. As Williams admits using the solid waste removal services of a company other than American Disposal and the Police Chief observed him engaging in this unlawful conduct, probable cause existed for the issuance of the citations. The fact that the citations were subsequently dismissed as the result of a plea bargain does not nullify the finding of probable cause.

In February 2003, Williams was issued a citation for disturbing the peace. Officer Hollingshead investigated the complaint filed by Short, a City resident. Short claimed that Williams gave him "the bird." When Short asked Williams about giving him "the bird," Williams replied, "You owe me money, asshole." Williams again gave Short "the bird" and told Short, "Fuck you." Williams admits that this version of the encounter is accurate. As Williams has admitted to the facts which gave rise to the violation of the City ordinance, Officer Hollingshead had probable cause to cite Williams for disturbing the peace.

In April 2003, another City resident, McCully, reported to Officer Hollingshead that Williams was making repeated phone calls to him and that Williams continued to call after being instructed to stop. Williams admits that McCully made this report. A prudent man would believe, based on McCully's report to Officer Hollingshead, that Williams had violated the City ordinance prohibiting harassment by phone. Accordingly, probable cause existed for the issuance of the citation. The fact that the prosecutor subsequently entered a nolle prosequi on the charge as the result of a plea bargain between Williams and the City prosecutor does not nullify the finding of probable cause.

In November 2003, Williams was cited for failure to yield to an emergency vehicle. Williams asserts that he was following a police car and when the police car turned around, Williams pulled into a driveway. The police car pulled in behind him and the officer got out of the car, threatening to arrest

25

Williams for stalking a police officer. Examining the facts in the light most favorable to Williams, it does not appear that the officer had probable cause to cite Williams for failure to yield to an emergency vehicle because the police car was not "approaching" Williams.           In the spring of 2004, Williams received two nuisance violations. Williams was cited in March 2004 for failing to post house numbers on his residence. Williams admits that he did not have house numbers displayed on his house at the time of the citation. Williams was cited in May 2004 because the height of the grass and weeds on his property was in excess of ten inches in height. Williams admits that the grass and weeds on his property were taller than ten inches in violation of the City ordinance. As Williams admits engaging in the unlawful conduct that violated the City's nuisance ordinances, probable cause existed for the issuance of these citations. Because Williams replaced the house numbers on his residence and cut his grass prior to his court appearance, the charges against him were dismissed. The dismissal does not nullify the finding of probable cause.

          In the fall of 2004 Williams was cited for violating the City's set back regulations. Williams admits that Officer Forrester inspected his property and determined that Williams' storage shed encroached on the City's alley. The matter proceeded to trial; the court found that Williams was "not guilty," but gave no rationale for the ruling. While inspecting Williams' property regarding the set back regulation, Officer Forrester also issued Williams citations for parking in the alley and for a pile of chat. These citations were subsequently dismissed as the result of a plea bargain with the prosecutor. Because Williams admits that the officer issuing the citations conducted an investigation of the property, thereby gathering facts and circumstances which would lead a prudent person to believe that Williams had violated a City ordinance, probable cause existed for the issuance of the citations. The fact that the citations were subsequently

26

dismissed either on a not guilty finding or as the result of a plea bargain does not nullify the existence of probable cause to issue the citation.

Williams has failed to prove that the officers issuing the citations for violations of various City ordinances were motivated by a retaliatory animus. The record reveals that the officers conducted an investigation, gathering facts and examining the circumstances of Williams' conduct, prior to issuing the citations. With respect to many of the citations, Williams openly admitted to engaging in the unlawful conduct. As the Police Chief and the City's police officers had probable cause to issue all but one of the citations to Williams, the Court need not inquire further into whether the Defendants were "motivated in part" by a desire to retaliate against Williams for exercising his right to criticize City officials and City policies. Refraining from further inquiry into a police officer's motive where the issuance of a citation is supported by probable cause balances society's interest in law enforcement with Williams' right to be free from retaliation for the exercise of his First Amendment rights. Ordinary citizens would pay a high price if critics of the City were not required to comply with City ordinances due to the exercise of their First Amendment rights.

      2.        *Williams' reliance on __Nauke__ and __Garcia__ is misplaced.*

Williams relies heavily upon the Eighth Circuit's decisions in Naucke and Garcia v. City of Trenton, 348 F.3d 726 (8th Cir. 2003), in support of his position that he has presented sufficient evidence of the Defendants' retaliatory motive to survive summary judgment. Williams asserts that "Naucke and Garcia make clear that retaliation for exercise of First Amendment protected activity need not be the sole motivation for the Defendants' adverse actions towards Williams." (Doc. #86). Williams argues that based on the Eighth Circuit's holdings in Naucke and Garcia, "the fact that there may have been 'probable cause'

27

for the numerous prosecutions, incident reports, withheld licenses and other harassment does not foreclose recovery." Id.

The Court finds Williams' reliance on Naucke and Garcia is misplaced as the holdings of both cases rely on the second, rather than the third, element of a First Amendment retaliation claim. In introducing its analysis in Naucke, the Eighth Circuit explicitly noted its assumption, without decision, that the adverse action was motivated by the plaintiff's exercise of her First Amendment rights. Naucke, 284 F.3d at 928. The Eighth Circuit proceeded to affirm the district court's grant of summary judgment in favor of the defendants holding that the plaintiff had failed to present sufficient evidence that the defendants' adverse actions were sufficiently egregious to chill a person of ordinary firmness from continuing in the constitutionally protected activity. The Eighth Circuit further held that the plaintiff "failed to present evidence of a causal connection between [the defendants] and several of the retaliatory acts she alleged." Id. Accordingly, Naucke does not stand for the legal propositions which Williams attributes to it as the defendants' motivation was not analyzed nor did it form the basis of the Eighth Circuit's decision.

Similarly, Garcia was decided on the second element of the plaintiff's First Amendment retaliation claim. In Garcia, the jury had returned a verdict in favor of the plaintiff and the Hon. Dean Whipple had granted judgement as a matter of law in favor of the defendants holding "that there was insufficient evidence to justify a rational conclusion that a person of ordinary firmness would be chilled by [the mayor's] conduct." Garcia, 348 F.3d at 728. The Eighth Circuit reversed the district court's entry of judgement as a matter of law in favor of the defendants holding that there was sufficient evidence to support the jury's verdict. Garcia, 348 F.3d at 729.

28

In Garcia, the plaintiff's proof of the defendants' retaliatory motive was not before the Eighth Circuit on appeal as the record clearly supported this element of the plaintiffs' First Amendment retaliation claim. In Garcia, the plaintiff was a business owner who had repeatedly complained to the mayor about local youths riding their bicycles in front of her store. Garcia, 348 F.3d at 727-28. The city had a local ordinance prohibiting the riding of bicycles on sidewalks and the plaintiff wanted the mayor to enforce the ordinance. Id. During a "heated exchange," the mayor told the plaintiff that a two-hour time limit on parking outside of her business would be enforced against her, and "he was taking this action because of her complaints about the bicycling ordinance." Id. at 728.

This type of evidence is absent from the record in the present case. Unlike the plaintiff in Garcia, Williams was not specifically told by a city official that the City's ordinances were being enforced against him because of his criticism of City officials, policies, and actions. Nor is there any other evidence in the record to establish retaliatory motive. Accordingly, Garcia does not support Williams' position that he has presented sufficient evidence of the Defendants' retaliatory motive to survive summary judgment.

### 3. Williams has failed to present sufficient factual support to prove that the Defendants were motivated by a retaliatory animus.

As factual support for his contention that the Defendants were motivated in part by Williams' exercise of his constitutional rights when issuing the citations, Williams points to his own abrasive and offensive behavior. (Doc. #68, p. 57). He describes himself as a vociferous critic of the City, its policies, its administration, its employees, its Council and its Mayor. Not only was he vociferous, he characterizes his conduct as "crude, crass and profane." Although a person of normal sensibilities would likely be irritated by Williams' frequent and obnoxious protests, there is no evidence in the record that the Mayor,

Case 3:04-cv-05055-GAF   Document 99   Filed 04/19/06   Page 29 of 36

the Police Chief or the Administrator ever voiced any frustration about Williams' behavior. The Mayor, the Police Chief and the Administrator, as public officials, are accustomed to dealing with disgruntled citizens and their complaints. Therefore, Williams' crude, crass and profane conduct does not give rise to the inference that the Defendants had a retaliatory motive for issuing Williams citations for violating the City's ordinances.

Williams further argues that "the temporal proximity of the [property] purchases to the prosecutions of Williams gives rise to the inference that the prosecutions were retaliatory." (Doc. #68, p. 57). The Eighth Circuit very recently addressed the use of temporal proximity to establish a retaliatory motive in Wilson v. Northcutt, 2006 WL 695466 (8th Cir. March 21, 2006). The plaintiff in Wilson alleged that the City of Malvern, Arkansas and various city officials retaliated against her for filing a civil suit against them when it towed her sister's mobile restaurant, the Café Fish. Wilson, 2006 WL 695466, *1-*2. The plaintiff argued that the temporal proximity between her filing suit and the trailer being towed three months later established that the defendants' motive in towing the Café Fish was retaliatory in nature. Wilson, 2006 WL 695466 at *4. The Eighth Circuit found that "temporal proximity is relevant but not dispositive." Id. citing Kiel v. Select Artificials, Inc., 169 F.3d 1131, 1136 (8th Cir. 1999) (en banc), cert. denied, 528 U.S. 818 (1999) ("Generally, more than a temporal connection between the protected conduct and the adverse . . . action is required to present a genuine factual issue on retaliation."). Id. at *4. The Eighth Circuit further found that the plaintiff's mere belief was insufficient to establish that a city official acted from a retaliatory motive. Id. at *4. Accordingly, the Eighth Circuit affirmed the district court's grant of qualified immunity on the grounds that the plaintiff failed to present sufficient evidence from which a retaliatory intent could be inferred. Id.

30

The first property purchase upon which Williams relies to demonstrate temporal proximity occurred more than one year prior to the issuance of the first citation. Williams claims that he first "crossed [the Mayor's] path" in either 2000 or 2001 when he "thwarted" the City's purchase of the 110 West Pennell property. The first citation was issued on July 25, 2002, for Williams' failure to obtain the requisite business licenses to operate an automotive repair and sales business at the 110 West Pennell property. The Court finds that when more than a year has elapsed between the protected conduct and the adverse action, there is not sufficient temporal proximity to give rise to the inference that the Defendants were motivated by some retaliatory animus. *See* Feltmann v. Sieben, 108 F.3d 970, 977 (8th Cir. 1997) (adverse action occurring six months after protected conduct is insufficient to support a claim of causal connection); Rath v. Selection Research, Inc., 978 F.2d 1087, 1090 (8th Cir. 1992) (internal citations omitted) (adverse action occurring four months after protected conduct is insufficient to support a claim of causal connection).

The temporal proximity of the Shira property purchase is significantly less tenuous. Although it is unknown when the Mayor, on behalf of the City, inquired about purchasing the Shira property, the record reveals that the Shiras entered into a contract to sell their property to the Williamses on July 10, 2002. The Shira property was deeded to the Williamses on July 25, 2002, the same day Williams received his first citation for failing to obtain the requisite business licenses to operate his automotive repair and sales businesses at the 110 West Pennell property. This citation was issued by the Police Chief. There is no evidence in the record that the Police Chief was aware of Williams' confrontation with the Mayor regarding the Shira property. Williams argues that the holding in Wilson "clarifies that temporal proximity and knowledge, if proven, as Williams contends he has proven, would have been a sufficient basis from which

31

to infer retaliatory intent."[4] (Doc. #78). Based on Williams' own interpretation of the <u>Wilson</u> opinion, he has failed to present sufficient evidence to give rise to an inference of retaliatory intent because Williams has failed to prove that the Police Chief was aware of the transaction involving the Shira property.

Williams proceeds to argue that the temporal proximity of his appearances before the City Council to the dates the citations were issued is sufficient to infer retaliatory intent. Williams argues that he had questioned and opposed the propriety of the City's trash contract and its application and spoke out about that at City Council meetings. He claims he voiced his opposition to the annexation of the 171 Ivy Road property at City Council meetings and assisted in a petition drive to stop the annexation. Williams asserts that he questioned the City's provision of free water and the forgiveness of taxes owed by the Briarbrook Country Club. Williams claims that he disputed a lien placed on rental property he owned for a tenant's unpaid water bill. He also complained about the placement of lead chat on property adjacent to his that caused polluted leaching and run-off. Finally, Williams asserts that "during the height of the ticketing and harassment," he opposed the highly controversial Rails-for-Trails initiative.

The Court does not doubt that Williams appeared at City Council meetings to voice his opposition to these issues. However, with the exception of his appearance at a City Council meeting on October 1, 2002 to oppose the Rails-for-Trails initiative,[5] Williams fails to offer any evidence of the dates of his City

---

[4]The Court does not acquiesce in Williams' interpretation of the <u>Wilson</u> holding. In <u>Wilson</u>, the plaintiff presented no evidence that the city official who had the Café Fish towed was aware of the suit the plaintiff had filed or that her sister owned the motor home. <u>Wilson</u>, 2006 WL 695466 at *4. The Eighth Circuit did not indicate whether this knowledge, coupled with sufficient evidence of temporal proximity, would have been sufficient to give rise to the inference of a retaliatory intent.

[5]The Court is aware of the date of Williams' appearance before the City Council to protest the Rails-for-Trails initiate based on the minutes of that City Council meeting submitted by the Defendants. (Doc. #57, Ex. 25).

Council appearances and other protests. It is impossible for a jury to determine whether or not the temporal proximity of the protected activity to the adverse action establishes a retaliatory motive if the dates of the protected activity are unknown.

Williams further argues that there is "substantial evidence" that the Mayor is a "vindictive person who used his political office to threaten and to make good on those threats." (Doc. #68). Williams offers no legal authority in support of his contention that retaliatory motive in a First Amendment retaliation case can be inferred from the city official's "vindictive" nature. Furthermore, Williams' evidence of vindictiveness is scant and may rise to the level of inadmissible character evidence. To establish the Mayor's allegedly vengeful character, Williams points to a disagreement with a fellow school board member in the 1970s and the termination of a City police chief in the 1990s. The Court finds that this evidence of past disagreements between the Mayor and third parties entirely unrelated to Williams' lawsuit is insufficient to give rise to the inference that the City's Police Chief and police officers were motivated by a retaliatory animus when issuing the citations to Williams.

Finally, Williams contends that retaliatory motive can be inferred "from the sheer number and pettiness of the prosecutions" and "the fact that Williams was prosecuted while the Mayor, his cronies, City Council members and other citizens were never prosecuted for similar offenses or received more favorable interpretations of City ordinance requirements." The record is replete with evidence that Williams repeatedly violated City ordinances. The fact that other people may or may not have been treated differently is irrelevant as the City police officers conducted investigations into Williams' unlawful conduct, determined that he was violating City ordinances and, consequently, issued Williams citations for violating City ordinances.

Williams has failed to present sufficient factual support to create a genuine issue of material fact for trial with respect to the motives of the Police Chief and the City police officers in issuing the citations to Williams. Therefore, summary judgment is GRANTED on Williams' First Amendment retaliation claim asserted against the Mayor, the Police Chief and the Administrator.

### 4.      *Municipal Liability*

In addition to asserting a § 1983 claim against the Mayor, the Police Chief and the Administrator, Williams also asserts a § 1983 claim against the City. The United States Supreme Court held in <u>Monell v. New York City Dept. of Soc. Serv.</u>, 436 U.S. 658, 694 (1978) that a municipality may not be held liable on a theory of respondeat superior for the unconstitutional acts of its employees or agents. Rather, a plaintiff seeking to impose § 1983 liability on a municipality is required to identify either an official municipal policy or a widespread custom or practice of unconstitutional conduct that caused the deprivation of the plaintiff's constitutional rights. *See* <u>Smith v. Watkins</u>, 159 F.3d 1137, 1138 (8th Cir. 1998). Here, the Court need not consider whether the City had an official written policy or whether the evidence reveals a pattern of widespread unconstitutional conduct because, based on the foregoing analysis, Williams has failed to prove a deprivation of his constitutional rights. Accordingly, the City's Motion for Summary Judgment is GRANTED.

34

**B.    Count II: Conspiracy**

In Count II of his Complaint, Williams asserts a conspiracy claim arising under 42 U.S.C. § 1985 against the Mayor, the Police Chief and the Administrator. (Doc. #1). The Defendants argue that Williams has failed to properly plead and prove a conspiracy claim arising under 42 U.S.C. § 1985 because Williams cannot establish that the Defendants were motivated by a "class-based, invidiously discriminatory animus." *See* Doc. #60 *quoting* <u>United Bd. Of Carpenters & Joiners of Am. Local 610 v. Scott</u>, 463 U.S. 825, 828-29 (1983). Williams concedes that he lacks evidence of a class-based discriminatory animus and urges the Court to allow him to amend his Complaint to assert a conspiracy claim arising under § 1983. (Doc. #68). The Defendants argue that Williams lacks the requisite "good cause" to amend his complaint to assert a conspiracy claim at this stage of the proceeding. (Doc. #75).

The Court finds that the Defendants will not be prejudiced by the amendment as the facts in the record fail to establish a prima facie conspiracy claim arising under § 1983. To prove his § 1983 conspiracy claim, Williams must show: (1) "that the defendant conspired with others to deprive him of a constitutional right," (2) "that at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy," and (3) "that the overt act injured the plaintiff." <u>Askew v. Millerd</u>, 191 F.3d 953, 957 (8th Cir. 1999). Williams is also required "to prove a deprivation of a constitutional right or privilege in order to prevail on a § 1983 civil conspiracy claim." <u>Askew</u>, 191 F.3d at 957.

Here, Williams alleges that the Defendants deprived him of his right to be free from retaliation in response to the exercise of his First Amendment rights. As noted above, Williams has failed to prove that the issuance of the citations was "motivated in part" by the exercise of his First Amendment rights because the Police Chief and the City police officers had probable cause to believe that Williams was violating the

35

City ordinances.  Accordingly, summary judgment in favor of the Defendants is GRANTED on Williams'

§ 1983 conspiracy claim because Williams has failed to prove a deprivation of his constitutional rights.

## CONCLUSION

The Defendants are entitled to summary judgment on Williams' First Amendment retaliation claim

and § 1983 conspiracy claim because Williams has failed to present sufficient facts to prove that the

Defendants were motivated by a retaliatory animus when issuing Williams 26 citations for violations of

various City ordinances.  Consistent with the Eighth Circuit's opinions in <u>Smithson</u> and <u>Foster</u>, this Court

finds that because probable cause existed for the issuance of the citations, the Court need not inquire further

as to whether the Defendants were motivated by a retaliatory animus.  If the issuance of a citation is

supported by probable cause, a vociferous critic of City officials and policy should not be able to use the

First Amendment to shield himself from criminal liability.  The public interest demands that all citizens

comply with City ordinances, including those who vigorously criticize the City, its officials, and its polices.

Accordingly, the Defendants' Motion for Summary Judgment is GRANTED.

**IT IS SO ORDERED**.

/s/ Gary A. Fenner
GARY A. FENNER, JUDGE
 United States District Court

DATED:   April 19, 2006

36